
# IN THE SUPREME COURT OF GUAM

## PEOPLE OF GUAM,
Plaintiff-Appellee/Cross-Appellant,

**v.**

## RENATO CAPILI BOSI,
Defendant-Appellant/Cross-Appellee.

Supreme Court Case No. CRA19-015
Superior Court Case No. CF0596-17

## OPINION

## Cite as: 2022 Guam 15

Appeal from the Superior Court of Guam
Argued and submitted on December 2, 2020
Via Zoom video conference

Appearing for Defendant-Appellant:
David J. Highsmith, *Esq.*
Assistant Public Defender
Public Defender Service Corporation
779 Rte. 4
Sinajana, GU 96910

Appearing for Plaintiff-Appellee:
Marianne Woloschuk, *Esq.*
Assistant Attorney General
Office of the Attorney General
Prosecution Division
590 S. Marine Corps Dr., Ste. 901
Tamuning, GU 96913


**E-Received**
12/27/2022 4:43:23 PM

BEFORE: F. PHILIP CARBULLIDO, Chief Justice; ROBERT J. TORRES, Associate Justice; and KATHERINE A. MARAMAN, Associate Justice.

**CARBULLIDO, C.J.:**

[1]     Defendant-Appellant Renato Capili Bosi appeals from his criminal judgment of conviction and denial of his motion for judgment of acquittal. A jury found Bosi guilty of five offenses: two counts of Second Degree Criminal Sexual Conduct (As a First Degree Felony) ("CSC II"), two counts of Fourth Degree Criminal Sexual Conduct (As a Misdemeanor) ("CSC IV"), and one count of Child Abuse (As a Misdemeanor). At sentencing, however, the trial court invoked its power under 9 GCA § 80.22 to reduce Bosi's two convictions for CSC II to convictions for CSC IV, *as a lesser included offense of CSC II*. On appeal, Bosi assigns error to the sufficiency of evidence, sufficiency of indictment, omission of a jury instruction, and the admission of certain evidence.[1] The People of Guam cross-appeal, arguing the trial court abused its discretion by reducing Bosi's CSC II convictions. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

[2]     The following evidence was presented. Before his arrest, Bosi was a pastor at the Living Lighthouse Baptist Church. Through the church, he became acquainted with a young female member of his congregation, A.D.G., who moved to Guam from the Philippines in April 2015.

[3]     By May 2016, the relationship between Bosi and A.D.G. had become personal and close. A.D.G. testified that because she was having problems at home, her parents entrusted her to the Bosi family's care. Bosi's wife testified that A.D.G.'s father allowed A.D.G. to spend weekends with the Bosi family so she could learn "godly things, and household chores." Transcript ("Tr.")

---

[1] Bosi also raises a double jeopardy argument, but that argument is predicated on reversal of his CSC II and CSC IV convictions. *See* Appellant's Br. at 14-15 (Feb. 11, 2020). Because we do not reverse these convictions, we need not reach this issue.

at 20 (Jury Trial, Apr. 16, 2019). During a period where A.D.G.'s mother was in the Philippines, Bosi suggested that A.D.G. stay with him and his wife, and A.D.G.'s father agreed because he trusted Bosi and considered him to be "like a brother." Tr. at 14 (Jury Trial, Apr. 15, 2019).

[4] While staying in the Bosi household, A.D.G. performed household chores and received guidance from Bosi on what he considered appropriate or inappropriate behavior, *see, e.g.*, Tr. at 42-45 (Jury Trial, Apr. 16, 2019) (lecturing A.D.G. about having a boyfriend); *id.* at 64-65 (counseling A.D.G. about propriety of a photo she posted on Facebook). A.D.G.'s mother testified that at one point, Bosi took A.D.G.'s cell phone and read all the messages between her and her boyfriend aloud in front of Mrs. Bosi and other individuals, and that A.D.G. cried while he did so. Multiple witnesses testified that A.D.G. was treated as a member of the Bosi family.

[5] A.D.G. testified that in May 2016, when she was 14 years old, Bosi improperly touched her intimate areas on two occasions. Both incidents occurred while A.D.G. was washing dishes at the Bosi family home. In the first incident, Bosi touched A.D.G.'s buttocks over her clothes; A.D.G. testified that she at first believed this touching may have been "an accident." Tr. at 87 (Jury Trial, Apr. 15, 2019). A.D.G. also testified to a second incident, in which Bosi placed his hand between A.D.G.'s legs and touched her primary genital area over her clothes.

[6] A.D.G. also testified about several unusual interactions between her and Bosi in the months following May 2016. In one incident, A.D.G. testified that Bosi came to visit her at her home and "forcibly kissed" her on the lips twice. *Id.* at 88-89, 108. In another incident, she alleged that Bosi purchased "Spandex" undergarments for her; Bosi told A.D.G. to keep these undergarments hidden from her parents and to not tell Bosi's wife about this gift. *Id.* at 90-91. In a third incident, Bosi sent A.D.G. an email in response to a photograph she had posted to Facebook, telling her that her lips looked "very kissable." *Id.* at 91. A.D.G. also testified that Bosi often called her cell phone

and sent her emails, and then told her to delete these emails "because his wife didn't know about our communication." *Id.* at 90, 92. When asked about the effect of Bosi's affections, A.D.G. stated that his actions "suffocated me to the point where I became suicidal." *Id.* at 95. A.D.G. also left the Living Lighthouse church following these events because she felt it "wasn't safe for me anymore." *Id.* at 97.

[7]     After trial, the jury returned a guilty verdict on all charges and counts. Bosi moved for a post-verdict judgment of acquittal, arguing there was insufficient evidence presented to support his CSC II and CSC IV convictions. The trial court denied this motion, holding that a reasonable jury could have found facts sufficient to support all elements of each offense.

[8]     Before sentencing, Bosi asked the trial court to invoke its power under 9 GCA § 80.22 to reduce his CSC II convictions to CSC IV convictions. The trial court agreed and did so. Bosi was thereafter sentenced to 6 months' incarceration for CSC IV, *as a lesser included offense* of CSC II in Charge One, Count One; 12 months' incarceration for CSC IV, *as a lesser included offense* of CSC II in Charge One, Count Two; no additional punishment for the CSC IV convictions in Charge Two, Counts One and Two; and 8 months' incarceration for Child Abuse in Charge Three, for a total sentence of 26 months' incarceration. However, the trial court suspended 12 months of the sentence, yielding a final sentence of 14 months' incarceration.

[9]     Bosi timely appealed, creating this case. The People of Guam also timely appealed under Supreme Court Case No. CRA19-017. We consolidated the two cases upon the People's motion.

## II.  JURISDICTION

[10]    This court has jurisdiction over an appeal from a final judgment of conviction under 48 U.S.C.A. § 1424-1(a)(2) (Westlaw through Pub. L. 117-240 (2022)); 7 GCA §§ 3107 and 3108(a) (2005); and 8 GCA § 130.15(a) (2005).

### III.  STANDARD OF REVIEW

[11]    When a defendant raises a sufficiency of the evidence argument by a motion for judgment of acquittal, we review the trial court's denial of that motion *de novo*.  *People v. Song*, 2021 Guam 14 ¶ 16 (quoting *People v. Aguon*, 2020 Guam 24 ¶ 11).  "We review the record to determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt."  *People v. Robert*, 2019 Guam 2 ¶ 8 (citing *People v. Diaz*, 2007 Guam 3 ¶ 10).  The People "must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom."  *People v. Song*, 2012 Guam 21 ¶ 28 (quoting *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).  "This highly deferential standard is in place to ensure that the sufficiency of the evidence review only invades the province of the jury 'to the extent necessary to guarantee the fundamental protection of due process of law.'"  *People v. Jesus*, 2009 Guam 2 ¶ 60 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

[12]    As a matter of first impression for this court, we apply abuse-of-discretion review to a trial court's reduction of an offense under 9 GCA § 80.22.  Usually, we review the trial court's sentencing decisions for abuse of discretion.  *See, e.g.*, *People v. Manila*, 2018 Guam 24 ¶ 7; *People v. Manibusan*, 2016 Guam 40 ¶ 12.  And we have specifically applied abuse-of-discretion review to the Justice Safety Valve Act of 2013, 9 GCA § 80.39—a statute, like 9 GCA § 80.22, which allows a court to impose a lesser sentence than would otherwise be compelled by Guam's penal statutes.  *See People v. Corpuz*, 2019 Guam 1 ¶¶ 42-43.  Abuse-of-discretion review is also appropriate for a reduction of offense under 9 GCA § 80.22.  The plain language of that statute states that a court "may enter judgment for a lesser included offense and impose sentence accordingly," when the court "is of the view that it would be unduly harsh to sentence the offender in accordance with the code."  9 GCA § 80.22 (2005).  Because 9 GCA § 80.22 is phrased in the

permissive ("*may* enter judgment"), and because the statute's applicability turns on the trial court's subjective "view" of whether a typical sentence would be "unduly harsh," *id.*, application of the statute is an act of discretion—which means our review must be to determine whether that discretion was abused. A sentencing court abuses its discretion when its sentence "is based on an erroneous conclusion of law or where the record contains no evidence on which the judge could have rationally based the decision." *Manila*, 2018 Guam 24 ¶ 7 (quoting *Manibusan*, 2016 Guam 40 ¶ 12).

[13]     When a defendant fails to object to an indictment before trial, the defendant waives his right to do so on appeal absent a showing of good cause. 8 GCA §§ 65.15(b), 65.45 (2005); *see also People v. White*, 2005 Guam 20 ¶ 16 (failure to timely object without good cause "precludes appellate review").

[14]     We review jury instructions for plain error when the defendant did not object at trial. *People v. Gargarita*, 2015 Guam 28 ¶ 11 (citing *People v. Felder*, 2012 Guam 8 ¶ 8). "Plain error is highly prejudicial error, which this court 'will not reverse unless (1) there was an error; (2) the error is clear or obvious under current law; (3) the error affected substantial rights; and (4) reversal is necessary to prevent a miscarriage of justice or to maintain the integrity of the judicial process.'" *Id.* (quoting *Felder*, 2012 Guam 8 ¶ 19).

[15]     When proper objections were made, we review for abuse of discretion the trial court's rulings on the authentication of evidence, *see In re N.A.*, 2001 Guam 7 ¶ 53, and the trial court's non-imposition of sanctions for violating a discovery order, *People v. Nego*, 2021 Guam 3 ¶ 24. If the trial court has abused its discretion, "the proper standard for evaluating whether reversal is required is the harmless error standard." *People v. De Soto*, 2016 Guam 12 ¶ 19 (quoting *People v. Perez*, 2015 Guam 10 ¶ 20). "A 'harmless error inquiry analyzes the following factors: (1) the

overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted evidence; and (4) whether such evidence was cumulative of other properly admitted evidence.'" *Id.* ¶ 43 (quoting *Perez*, 2015 Guam 10 ¶ 35).

[16]     When proper objections were *not* made, our review of the trial court's evidentiary rulings is for plain error. *See People v. Quintanilla*, 2020 Guam 8 ¶ 17; 8 GCA § 130.50(b) (2005) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."). An objection made under one evidentiary theory does not preserve abuse-of-discretion review on other evidentiary theories not raised at trial. *See Quintanilla*, 2020 Guam 8 ¶ 17; *see, e.g.*, *State v. Jensen*, 472 N.W.2d 423, 429 (Neb. 1991) ("A party is barred from asserting a different ground for his or her objection to the admission of evidence on appeal than was offered before the trier of fact.").

## IV.  ANALYSIS

### A.  The Evidence Was Sufficient to Sustain Bosi's Criminal Sexual Conduct Convictions

[17]     Bosi challenges the sufficiency of the evidence supporting his convictions for CSC II under 9 GCA § 25.20(a)(2) and CSC IV under 9 GCA § 25.30(a)(1). A defendant is guilty of CSC II, as charged, if he or she engages in sexual contact with another person and:

> that other person is at least fourteen (14) but less than sixteen (16) years of age and the actor is a member of the same household as the victim, or is related by blood or affinity to the fourth degree to the victim, or is in a position of authority over the victim and the actor used this authority to coerce the victim to submit . . . .

9 GCA § 25.20(a)(2) (2005). A person is guilty of CSC IV, as charged, if he or she engages in sexual contact with another person and "force or coercion is used to accomplish the sexual contact." 9 GCA § 25.30(a)(1) (2005).

**[18]**     Under Guam law as it existed at the time of Bosi's trial,[2] when a defendant with no prior criminal record engages in sexual contact with a person at least 14 years of age,[3] under circumstances involving force or coercion, or where the victim is mentally defective, mentally incapacitated, or physically helpless, the defendant commits CSC IV—a misdemeanor offense. *See* 9 GCA § 25.30 (2005).  But if the victim of the sexual contact is at least 14 but less than 16 years old, and if the defendant and victim have one of three relationships listed in 9 GCA § 25.20(a)(2), the degree of the offense increases all the way to a first-degree felony—the highest classification under Guam law.  *See* 9 GCA § 25.20(b) (2005).  While a misdemeanor (like CSC IV) is punishable by no more than one year of incarceration, a first-degree felony (like CSC II) is punishable by a minimum of five, and up to twenty, years of incarceration.  *See* 9 GCA §§ 80.30(a), 80.34(a) (2005).

**[19]**     Guam's CSC statutes were patterned after Michigan's, so we typically find interpretations of Michigan's CSC statutes persuasive.  *People v. Ehlert*, 2019 Guam 3 ¶ 20 (citing *People v. Cummins*, 2010 Guam 19 ¶ 21).  In *People v. Garrison*, the Michigan Court of Appeals discussed the legislative intent behind designating a "same household" relationship to be an aggravating factor for certain CSC offenses:

> We agree with the trial court that the stated purpose of the criminal sexual conduct statute was to increase the penalty where the sexual penetration occurred in situations within a household. . . .   The increased penalty imposed by the legislation is a reflection of the fact that people in the same household, those living together, bear a special relationship to one another.  That relationship is specifically protected by the increased penalty . . . .

---

[2] Title 9 GCA 25.30 has since been amended and now imposes a third-degree-felony offense for all defendants convicted of CSC IV unless it is the defendant's first offense and the victim is eighteen or older; in such cases, the offense would be a misdemeanor.  *See* Guam Pub. L. 36-079:1 (Feb. 9, 2022).

[3] The victim's age is not an element of CSC IV under 9 GCA § 25.30.  However, if a victim of sexual contact is 13 years old or younger, that act is punishable as CSC II even without proof of force or coercion, or the victim being mentally defective, mentally incapacitated, or physically helpless.  *See* 9 GCA § 25.20(a)(1) (2005).

> In context, the legislative intent is to proscribe sexual penetration in those instances involving young persons and members of the same family group, bounded by the "household". Under prior law, incest, which was based on a familial relationship unrelated to age, carried a less severe penalty than did statutory rape. The first-degree criminal sexual conduct statute evidences a strong legislative intent to specify several situations in which the chance for sexual abuse of young persons is acute.

341 N.W.2d 170, 172-73 (Mich. Ct. App. 1983). Similar logic applies to the three relationships between defendant and victim listed in 9 GCA § 25.20(a)(2). By imposing a more severe penalty where the defendant and victim are related by blood, where the defendant and victim are members of the same household, or where the defendant is in a position of authority over the victim and uses that authority to coerce the victim, the Guam Legislature sought to provide greater protections for young persons in particularly vulnerable situations—situations where the chance for sexual abuse is acute because the defendant has special access to or authority over the victim, and the victim may be unlikely to report the abuse.

[20] With this legislative policy in mind, we turn to the evidence supporting Bosi's conviction for CSC II. The elements of the offense, as charged, are: (1) sexual contact; (2) a victim at least 14 but less than 16 years old; and (3) one of the relationships between victim and defendant listed in the statute. 9 GCA § 25.20(a)(2). Bosi does not challenge the evidence supporting a jury finding that sexual contact occurred or that A.D.G. was 14 years old at the time of that sexual contact. A.D.G.'s testimony supports these findings, and "direct evidence of one witness who is entitled to full credit is sufficient proof of any fact." *People v. Campbell*, 2006 Guam 14 ¶ 40 (citation omitted); *see also Perez*, 2015 Guam 10 ¶ 36 ("[T]he testimony of a sexual assault victim does not need to be corroborated, and a victim's testimony alone can support a criminal sexual conduct conviction.").

**[21]**	Bosi's challenge instead focuses on the alleged lack of evidence supporting a finding that Bosi and A.D.G. had a relationship listed under 9 GCA § 25.20(a)(2): that they were members of the same household, related to one another by blood or affinity, or that Bosi held a position of authority over A.D.G. and used this authority to coerce A.D.G. to submit. *See* Appellant's Br. at 8-13 (Feb. 11, 2020). Nothing in the record suggests that Bosi and A.D.G. are related by blood or affinity, so that theory does not apply. And while Bosi devotes some briefing to the lack of evidence he and A.D.G. were members of the same household, *e.g.*, Appellant's Br. at 9, the People assert they exclusively argued a "position of authority" theory in closing arguments at trial, and they exclusively argue the "position of authority" theory on appeal. Appellee's Br. at 16 (June 29, 2020). We thus limit our analysis to whether there was sufficient evidence to prove the "position of authority" prong of the statute.

**[22]**	We need not belabor the analysis of whether Bosi held a position of authority over A.D.G.; as shown in the factual background above, *see supra* Part I, ample testimony from several witnesses suggested Bosi was not only A.D.G.'s pastor, but also a mentor, a parental figure, and an occasional caretaker. From this evidence, a rational jury could infer that Bosi held a position of authority over A.D.G. The closer questions are whether there was sufficient evidence that Bosi *coerced* A.D.G. and whether he *used his authority* over her to do so.

**[23]**	Guam's CSC statutes do not specifically define "coercion,"[4] and this court has not adopted a single, all-encompassing definition of the phrase. Instead, we have considered the question of what is "coercion" through analysis of case law from other jurisdictions, most prominently

---

[4] Title 9 GCA § 25.10(a) partially defines the phrase "force or coercion," a term used in several CSC offenses, by listing five circumstances in which "force or coercion" can arise. However, the statute also states the listed examples are non-exhaustive, as force or coercion "is not limited to any of the following circumstances." 9 GCA § 25.10(a)(2) (2005) (definition now found in subsection (a)(3) per amendments made in Guam Pub. L. 36-101:2 (June 15, 2022)). As we noted in *People v. Tenorio*, "The Guam Legislature clearly did not intend to limit the definition of 'coercion' to the enumerated examples" provided by that statute. 2007 Guam 19 ¶ 19 n.10.

Michigan. *See People v. Tenorio*, 2007 Guam 19 ¶¶ 29-31. From Michigan law, we have recognized that coercion may be "actual, direct, or positive, as where physical force is used to compel act against one's will, or implied, legal or constructive, as where one party is constrained by subjugation to other to do what his free will would refuse." *Id.* ¶ 30 (quoting *People v. Premo*, 540 N.W.2d 715, 717 (Mich. Ct. App. 1995)).

[24]    In *Tenorio*, we promoted a non-exhaustive, multi-factor "totality of the circumstances" test as a method for determining whether there was sufficient evidence of coercion:

> [F]actors indicative of forcible compulsion (or the threat of forcible compulsion) include, but are not limited to, "the respective ages of the victim and the accused, the respective mental and physical conditions of the victim and the accused, the atmosphere and physical setting in which the incident was alleged to have taken place, the extent to which the accused may have been in a position of authority, domination or custodial control over the victim, and whether the victim was under duress.

*Id.* ¶ 20 (quoting *Commonwealth v. Titus*, 556 A.2d 425, 427 (Pa. Super. Ct. 1989)). The trial court cited *Tenorio* and applied this multi-factor test against Bosi's motion for judgment of acquittal:

> [T]he Court finds that the coercive element is satisfied. Here, the acts Defendant was found guilty of occurred when the victim was fourteen years old, and Defendant was fifty-six years old; Defendant held both a pastoral and custodial role with the victim; the victim stayed at the Defendant's home on weekends and stayed overnight; the incidents occurred at Defendant's home; and testimony provided that Defendant had the power to make decisions on a number of very intimate matters in the victim's life, including dating, dress code, and spending time with siblings. Testimony also provided that Defendant had the power to go into the victim's cell phone and read private messages, as well as order her to delete certain emails and messages.

Record on Appeal ("RA"), tab 89 at 3-4 (Dec. & Order, June 13, 2019). The trial court also noted that while there was conflicting testimony on some of these facts, it was within the power of the jury to resolve such conflicts for itself. *Id.* at 4.

[25]    We agree with the trial court's analytical approach: the evidence of coercion presented here counsels for a "totality of the circumstances" analysis. The jury was asked to infer "implied, legal or constructive" coercion from evidence showing how much Bosi exerted control over A.D.G.'s life. The evidence of coercion was largely circumstantial, but that the evidence is circumstantial is not itself problematic. The prosecution may prove coercion with this type of evidence. *See State v. Trevino*, 833 P.2d 1170, 1173 (N.M. Ct. App. 1991) ("Use of a position of authority to coerce sexual contact may be proven inferentially." (citation omitted)); *State v. Day*, 501 N.W.2d 649, 651 (Minn. Ct. App. 1993) ("[P]roof of coercion does not require proof of a specific act or threat." (quoting Minn. Stat. Ann. § 609.341, subd. 14 (1990))); *Oates v. State*, 844 S.E.2d 239, 242 (Ga. Ct. App. 2020) ("Force [which under Georgia law includes mental coercion] may be inferred from intimidation arising from the familial relationship and may be proved by direct or circumstantial evidence." (citations omitted)); *see also People v. Martin*, 2018 Guam 7 ¶ 26 ("[T]he fact that . . . evidence is circumstantial does not undermine its sufficiency."). The question is whether this circumstantial evidence was enough for a jury to make a reasonable finding of coercion.

[26]    Our review of the sufficiency of evidence is "highly deferential" in favor of upholding the jury's determinations. *Campbell*, 2006 Guam 14 ¶ 10 (quoting *People v. Sangalang*, 2001 Guam 18 ¶ 20). Thus, "the People 'must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom.'" *Song*, 2012 Guam 21 ¶ 28 (quoting *Sisk*, 343 S.W.3d at 65). Viewing the evidence in the light most favorable to the People and drawing all reasonable inferences in their favor, a rational jury could have found coercion through inferential reasoning.

**[27]**     Circumstantial evidence gives rise to a plausible inference that A.D.G. was constrained by subjugation against reacting as her free will would dictate; there was thus evidence of "implied, legal or constructive" coercion.  A rational jury could have found, from the ample testimony supporting the premise that Bosi had a close personal relationship with A.D.G., that Bosi had special access to her, which allowed him to be alone with her inside his home.  A rational jury could have found that because Bosi exerted control over so many facets of A.D.G.'s life, she was especially vulnerable to Bosi's advances.  And, from that inference of a special vulnerability, a rational jury could have also inferred that when Bosi sexually touched A.D.G., he made her feel "constrained by subjugation" from reacting to his advances as she otherwise might have, had the perpetrator been someone who did not occupy such a powerful role in her life.  A rational jury could have inferred, given all the circumstances, that A.D.G. felt constrained from exercising her free will to resist or otherwise object to the touching, to call out to others in the house for help, or to immediately report the touching to her parents or another adult.

**[28]**     We typically find Michigan case law persuasive in criminal sexual conduct cases, and Michigan case law supports the premise that "implied, legal or constructive" coercion may be found through inferences drawn from circumstance.  For example, in *People v. Premo*, the defendant, a high school teacher, was charged with CSC IV for pinching the buttocks of three students on separate occasions.  540 N.W.2d 715, 716 (Mich. Ct. App. 1995).  The defendant contended that pinching the students' buttocks was insufficient to satisfy the requirement of "force or coercion" necessary for a CSC IV conviction.  *Id.*  The *Premo* court determined that the defendant's actions were coercion by virtue of his position of authority over the students.  *Id.* at 717-18.  The court held that the "defendant's actions constituted implied, legal, or constructive coercion because, as a teacher, defendant was in a position of authority over the student victims

and the incidents occurred on school property. Defendant's conduct was unprofessional, irresponsible, and an abuse of his authority as a teacher." *Id.* at 718.

[29]     In *People v. Reid*, the victim's father knew the defendant through work and confided in him that his son was having problems in school. 592 N.W.2d 767, 770 (Mich. Ct. App. 1999). Eventually, Reid offered to help talk to the victim, telling the father he used to be a counselor at church and had dealt with kids before. *Id.* at 770-71. One night, Reid invited the victim to spend the night at his home, gave the victim several glasses of soda spiked with alcohol, and engaged in multiple acts of sexual penetration with the victim, who did not resist the acts. *Id.* at 771-72. The *Reid* court found sufficient evidence proving the defendant was in a position of authority over the victim and used this position of authority to coerce the victim to submit to the sexual penetration. *Id.* at 773-75. Viewing the evidence in a light most favorable to the prosecution, the court found that Reid was placed in a "position of practical authority" over the victim because the victim had been entrusted by his parents to Reid's care and was alone with Reid at a location where he was isolated from others and subject to Reid's general control. *Id.* at 775. Likening the case to the situation with the high school teacher in *Premo*, the court determined there was sufficient evidence that the victim was in a position of special vulnerability as to Reid, and that "a reasonable jury could have found that [Reid] exploited the special vulnerability attendant to his relationship with the [victim] to abuse him sexually." *Id.*

[30]     In *People v. Knapp*, the defendant was a reiki[5] instructor, and the victim was the defendant's underage student. 624 N.W.2d 227, 233 (Mich. Ct. App. 2001). Under the guise of spiritual instruction, the defendant persuaded the victim to remove his clothing and to touch the

---

[5] Defined by the Michigan court as "an ancient healing art that involves 'energy centers' in the body called chakras." *People v. Knapp*, 624 N.W.2d 227, 233 (Mich. Ct. App. 2001).

defendant's genitals. *Id.* at 234. On appeal, the defendant challenged the evidence supporting a finding that he coerced the victim into submission; the appellate court disagreed, holding:

> [T]he characteristic dominant and subordinate roles in any teacher-student relationship places the student in a position of special vulnerability. We find the circumstances of this case particularly illustrative of this point. Complainant was the only young adolescent in a class taught and attended by adults. Given his age, the unconventional nature of the "curriculum," and the trust defendant fostered with complainant's mother, complainant was highly susceptible to abuse. Under these circumstances, we find that defendant exploited and abused his position of authority to compel an extremely vulnerable youth to engage in sexual contact. This clearly constitutes coercion for purposes of this section of the CSC II statute.

*Id.* at 236. We agree with the reasoning of the *Premo*, *Reid*, and *Knapp* courts: there is sufficient evidence of coercion where there is evidence to support the premise that the victim was in a position of special vulnerability to the defendant, and the defendant exploited that special vulnerability to overcome the free will of the victim. These cases support upholding the conviction here. The evidence presented below, that Bosi held a mentorship and almost custodial position over A.D.G., and the inferences advanced by the People regarding that evidence, may not have overwhelmingly compelled such a finding, but it was sufficient to allow for it. A jury is "free to choose among reasonable interpretations of the evidence." *Jesus*, 2009 Guam 2 ¶ 62 (quoting *United States v. Boskic*, 545 F.3d 69, 85 (1st Cir. 2008)). The jury did that here, and we affirm its ability to have done so.

[31]   Bosi also raises a factual impossibility argument: he suggests that A.D.G. could not have been "coerced into submission" because, in his view, "[A.D.G.] testified that both incidents involved abrupt, momentary groping. [She] did not 'submit' in any sense—it all happened too quickly." Appellant's Br. at 10. However, the questions of whether the incidents were "abrupt" and "momentary," and whether the touching occurred "too quickly" for A.D.G. to have submitted, are questions of fact committed to the jury. A.D.G. did not specifically testify that the incidents

were "abrupt" or "momentary"; she was not asked, and did not volunteer, the duration of either incident. While a rational jury could have drawn the same inference as Bosi—that the touching was too brief for "submission" to occur—a rational jury could have also reached the opposite conclusion. In this circumstance, it is appropriate to defer to the jury's findings, not to impose our own judgment. *See Jesus*, 2009 Guam 2 ¶ 19 ("[I]t is not the appellate court's function to determine guilt or innocence. . . . Those judgments are exclusively for the jury, given always the necessary minimum evidence *legally* sufficient to sustain the conviction." (alteration in original) (quoting *Kotteakos v. United States*, 328 U.S. 750, 763-64 & n.18 (1946))).

[32]    Bosi further challenges the sufficiency of the evidence supporting his convictions for CSC IV, but this challenge fails for the same reason as his challenge to the CSC II convictions. To prove CSC IV, as charged, the People had to prove that Bosi engaged in sexual contact with A.D.G. and that "force or coercion [was] used to accomplish the sexual contact." 9 GCA § 25.30(a)(1) (2005). As we have established, there was sufficient evidence to support a jury finding that Bosi used coercion to accomplish sexual contact with A.D.G., and the same evidence that supported a jury finding of "coercion" for CSC II supported a jury finding of "force or coercion" for CSC IV. A.D.G.'s testimony was also sufficient to sustain a jury finding of "force or coercion" based on surprise. "Force or [c]oercion," as defined by statute, includes the circumstance "when the actor, through concealment or by the element of surprise, is able to overcome the victim." 9 GCA § 25.10(a)(2)(E) (2005) (definition now found in subsection (a)(3)(E) per amendments made in Guam Pub. L. 36-101:2 (June 15, 2022)). A.D.G.'s account of how the sexual touching occurred— *e.g.*, while she was performing household chores, and with no apparent forewarning—permits a reasonable inference that Bosi used the element of surprise to accomplish sexual touching against

A.D.G.'s will.  *Cf. Ehlert*, 2019 Guam 3 ¶¶ 15-22 (upholding a finding of "force or coercion" based on surprise).[6]

[33]    Drawing all inferences for the People, and with proper deference to the findings of the jury, we conclude the trial court did not err in denying Bosi's motion for judgment of acquittal on the criminal sexual conduct charges.

## B.  The Trial Court Did Not Abuse its Discretion in Reducing Bosi's CSC II Convictions to CSC IV Convictions

[34]    While there was sufficient evidence to support the CSC II convictions, the trial court did not enter judgment for CSC II; instead, it exercised discretion under 9 GCA § 80.22 to reduce Bosi's CSC II convictions to additional CSC IV convictions.  On cross-appeal, the People argue from two angles that the trial court made a mistake of law in applying the reduction statute.  First, in their opening brief, the People argue that the trial court erred because it "decided that the facts did not support the [CSC II] conviction," i.e., by reweighing the evidence.  Appellee's Br. at 52.[7] Then, in their reply brief, the People also argue that the trial court's reduction of offense did not track the statutory language of 9 GCA § 80.22, Appellee's Reply Br. at 7-11 (Aug. 12, 2020), i.e., by failing to limit its analysis to the "nature and circumstances of the offense and to the history and character of the offender," 9 GCA § 80.22.

---

[6] Bosi's argument that *People v. Ehlert* requires reversal in this case is based on a misreading of that case. *See* Appellant's Br. at 11-12; Appellant's Reply Br. at 3-4 (July 29, 2020).  It is true that in *Ehlert*, there was a "surreptitious approach . . . that was separate from the actual or attempted . . . touching itself." 2019 Guam 3 ¶ 22. However, that approach was simply done "from behind" while it was "dark outside, but with enough moonlight to discern faces." *Id.* ¶ 21.  There was not a clear demarcation between the approach and the actual touching.  Here too, a reasonable jury could find that by approaching A.D.G. from behind while she was doing chores, Bosi acted with an "element of surprise."

[7] In their opening brief, the People rely mainly on a single California case, *People v. Johnston*, 7 Cal. Rptr. 3d 161 (Ct. App. 2003).  We read *Johnston* to mean that a sentencing court cannot, after independently reweighing the evidence, sentence the defendant in accordance with a crime he did not commit, i.e., a crime that is not a lesser-included offense of the offense he was found guilty of. *See* 7 Cal. Rptr. 3d at 172.  We find *Johnston* inapplicable here because, as we shall explain, the trial court did not independently reweigh the evidence.  We also note that the People do not return to *Johnston* in their reply brief and concede their opening brief argument was "inartfully worded" with respect to its arguments about the trial court's alleged reweighing of the evidence.  Appellee's Reply Br. at 4 (Aug. 12, 2020).  We therefore treat the *Johnston* line of argument as abandoned.

[35]     We have not had prior cause to examine 9 GCA § 80.22 in detail; it is, as Bosi notes, "an unusual and seldom used law." Appellant's Reply Br. at 16 (July 29, 2020). The statute tracks Model Penal Code § 6.12, a provision of the Code that has not found widespread adoption in other jurisdictions. The Council to the American Law Institute has suggested that Model Penal Code § 6.12 "has enjoyed so few state adoptions, and has had so little influence on actual judicial practice, that deletion [from the Code] is appropriate." Model Penal Code: Sentencing § 6.12 (Am. Law Inst., Tentative Draft No. 2, 2011). But 9 GCA § 80.22 is the law of Guam.

[36]     To determine what 9 GCA § 80.22 requires of the trial court, we begin by applying our usual canons of statutory construction. When interpreting a statute, "[a]bsent clear legislative intent to the contrary, the plain meaning prevails." *Enriquez v. Smith*, 2015 Guam 29 ¶ 14 (citation omitted). "If a statute is unambiguous, then judicial inquiry [into the meaning of the statute] is complete." *People v. Quichocho*, 1997 Guam 13 ¶ 5. Here, the statute provides:

> If, when a person has been convicted of an offense, the court, having regard to the nature and circumstances of the offense and to the history and character of the offender, is of the view that it would be unduly harsh to sentence the offender in accordance with the code, the court may enter judgment for a lesser included offense and impose sentence accordingly.

9 GCA § 80.22. The statute is unambiguous: if the trial court finds that the typical sentence associated with a conviction would be "unduly harsh" given the nature and circumstances of the offense and the history and character of the defendant, the trial court may exercise its discretion to instead enter conviction on a lesser included offense and sentence the defendant under that lesser offense. *Cf. State v. Megargel*, 673 A.2d 259, 264 (N.J. 1996) (characterizing the analysis under Model Penal Code § 6.12 as a "one step 'unduly harsh' test"). The statute clarifies that a finding of undue harshness should derive from an analysis of "the nature and circumstances of the offense" and "the history and character of the offender." 9 GCA § 80.22; *see Megargel*, 673 A.2d at 264.

Finally, the statute permits the trial court to reduce the conviction only to that of a lesser included offense, and to impose a sentence corresponding to the degree of the lesser included offense.

[37]     We are satisfied the trial court considered the nature and circumstances of the offense, and the history and character of the offender, in reducing Bosi's CSC II convictions.  As for the nature and circumstances of the offense, the trial court considered and made findings on these factors: (1) the sexual touching was made over A.D.G.'s clothing; (2) the sexual contact occurred in an open space rather than a secluded area; and (3) the sexual contact could be characterized as "slight" in nature compared to other acts amounting to CSC II.  Tr. at 4-5 (Cont'd Sent'g Hr'g, Aug. 8, 2019).  As for the history and character of the offender, the trial court noted considerable testimony showing Bosi had been a positive influence on others in the community.  *Id.* at 5.  These findings fall within what the statute commands the trial court to consider.

[38]     The People, however, read these and similar comments by the trial court to suggest the reduction was based at least in part on the trial court's view of the weight of the evidence.  *See* Appellee's Br. at 52; Appellee's Reply Br. at 9-10.  The allegedly problematic comments made by the trial court include:

1.  "The use of authority to coerce for submission is really the element that presents perhaps the most challenge.  The Court appreciates the ability to appeal matter subsequently.  Notwithstanding that, in review of the facts, there's certainly tenable argument that can be made in a way against that finding.  The Court can and would understand that.  At the same time, the Government would believe that that was perhaps the most appropriate hence the charging as a first degree felony."  Tr. at 4 (Cont'd Sent'g Hr'g, Aug. 8, 2019).

2.  "In reviewing the facts, the Court is aware that the sexual contact that occurred could be characterized as follows: that that contact occurred in an open space, I believe it would be the kitchen area of the household; that that contact was made in a matter over clothing and can be characterized potentially as slight but importantly perhaps the fact that it was over clothing is to a degree significant and that it was in an open space is also significant."  *Id.* at 4-5.

3.  "If I were to go forward [with reducing the CSC II offenses under 9 GCA § 80.22], the exposure would be essentially for three distinct misdemeanors, each punishable up to one full year in prison, and I am inclined to do that." *Id.* at 5.

4.  "The age of the minor is really what drove the charges, and I understand that. And albeit she may be a bit older now, the fact that this occurrence of a criminal act was perpetrated against a minor, 14 to 16, is most significant." *Id.* at 6.

5.  "As far as the Court is concerned, I've heard much about what [Bosi had] done in the past. I acknowledge that, but even the best people will make mistakes." *Id.* at 9.

[39]    None of these comments—whether read individually or cumulatively—support the aggressive inferences that the People ask the court to draw as to the trial court's motivation for reducing Bosi's convictions. We are unpersuaded, for example, that the trial court's use of the word "slight" in the second comment proves that the trial court "impermissibly attempted to weigh the sufficiency of the evidence," Appellee's Reply Br. at 9-10, or that the third comment proves the trial court "tried to . . . make two of the convictions disappear," *id.* at 10. The People's position is not well-supported by the record; it amounts to little more than speculation about the trial court's internal motivations. We are disinclined to engage in such speculation.

[40]    The People also argue that the trial court erred by not making an explicit finding that the sentence associated with CSC II would be "unduly harsh" under the circumstances. While we agree that the best practice for the trial courts is to make this finding explicitly, we decline to adopt a "magic words" requirement. *See State v. Ziller*, 807 N.W.2d 241, 245 (Wisc. Ct. App. 2011) ("While a [trial] court must articulate the basis for its sentence, it is not required to use magic words."); *cf. People v. Enriquez*, 2014 Guam 11 ¶ 19 (rejecting a "magic words" approach in another context). Here, it is clear from the record that the trial court applied 9 GCA § 80.22 because it believed convicting and sentencing for CSC II would be unduly harsh considering its view of the offense and offender. A remand simply to confirm what is already clear in context would be inefficient and would not benefit the parties or the administration of justice.

**[41]**  A trial court's exercise of discretion will be reversed only if the reviewing court has a "definite and firm conviction the trial court, after weighing relevant factors, committed clear error of judgment in its conclusion." *People v. Tuncap*, 1998 Guam 13 ¶ 12 (citing *United States v. Plainbull*, 957 F.2d 724, 725 (9th Cir. 1992)).  We form no such conviction here.  Although we cannot say with certainty what motivated the trial court's decision to reduce the offense, the trial court substantially met the requirements of 9 GCA § 80.22, considered relevant factors, and made appropriate findings to support its decision.  Thus, the trial court did not abuse its discretion in reducing Bosi's CSC II convictions to CSC IV.

## C.  Bosi Waived His Challenge to the Indictment

**[42]**  Next, Bosi claims error in the indictment, arguing it "did not properly state the alternative elements of the offense" of CSC II.  Appellant's Br. at 18.  Although he does not use the term, Bosi seems to argue the indictment was duplicitous, meaning that "a single count combines two or more different offenses." *People v. Quenga*, 2015 Guam 39 ¶ 52 (quoting *United States v. Renteria*, 557 F.3d 1003, 1007-08 (9th Cir. 2009)).  We do not reach the issue, however, because Bosi's failure to raise the issue in a timely manner constitutes a waiver.

**[43]**  Bosi's indictment set forth the charges of CSC II:

> On or about the period between May 1, 2016 through May 31, 2016, *inclusive,* in Guam, **RENATO CAPILI BOSI** (*aka* **Ray**) did commit the offense of ***Second Degree Criminal Sexual Conduct (As a 1ˢᵗ Degree Felony)***, when he intentionally engaged in sexual contact with another, to wit: by touching the primary genital area of A.D.G. . . . , a minor at least fourteen (14) but less than sixteen (16) years of age, and **RENATO CAPILI BOSI** (*aka* **Ray**), was a member of the same household as of [sic] A.D.G. . . . , or was related to A.D.G. . . . , by blood or affinity to the fourth degree or was in a position of authority over A.D.G. . . . , and used this authority to coerce A.D.G. . . . to submit, in violation of 9 GCA §§ 25.20(a)(2) and (b).

RA, tab 12 at 1-2 (Indictment, Oct. 27, 2017).  This tracks the language of 9 GCA § 25.20(a)(2), and "[a]n indictment which tracks the words of the statute charging the offense 'is sufficient as

long as the words unambiguously set forth all the elements of the offense.'" *People v. Torres*, 2014 Guam 8 ¶ 20 (quoting *People v. Jones*, 2006 Guam 13 ¶ 23). An indictment of this nature is sufficient because it performs the essential functions of the document: to "apprise[] a defendant of the crime with which he is charged so as to enable him to prepare his defense and to plead judgment of acquittal or conviction as a plea to subsequent prosecution for the same offense." *Jones*, 2006 Guam 13 ¶ 12 (quoting *Portnoy v. United States*, 316 F.2d 486, 488 (1st Cir. 1963)). Bosi concedes that the indictment was "basically sufficient as . . . charged." Appellant's Br. at 19. Despite this concession, he still claims the indictment endangered jury unanimity because it alleged multiple theories of CSC II under 9 GCA § 25.20(a)(2). In Bosi's view, the three enumerated relationships under 9 GCA § 25.20(a)(2) represent "three alternative elements, not three means of committing the same offense." Appellant's Br. at 20.

[44] However, a defendant must object to an indictment before trial, unless his objection is that the indictment either fails to show jurisdiction or fails to charge an offense. 8 GCA § 65.15(b). If a defendant fails to object to the indictment before trial, the defendant waives his right to do so on appeal absent showing good cause. 8 GCA § 65.45; *see also Martin*, 2018 Guam 7 ¶ 11. Bosi did not object to the indictment before trial, and his challenge does not implicate jurisdiction or a failure to charge an offense; the issue is therefore waived.

[45] Bosi argues that the waiver rule does not apply, or there is good cause to set aside his waiver, because his challenge to the indictment was not a "defense, objection or request . . . capable of determination without the trial of the general issue." 8 GCA § 65.15. Bosi claims his objection to the indictment could not have been raised until "the defense learned of the contradictions in [A.D.G.'s] story about when the abuse occurred," by which he appears to mean during trial. Appellant's Reply Br. at 8. We disagree. If it is Bosi's position that the indictment was defective

for pleading three distinct offenses within a single charge, i.e., that the indictment is duplicitous, then he alleges an error of law inherent to the indictment from its issuance. While Bosi may not have noticed the duplicity issue until or after trial, his lack of awareness neither exempts his challenge from 8 GCA § 65.15 nor constitutes good cause to set aside the waiver. But if it is Bosi's position that the indictment was "basically sufficient as charged," but lost sufficiency because of A.D.G.'s trial testimony, we do not understand Bosi's reasoning or how this alleged insufficiency arose. The indictment adequately apprised Bosi of the crime with which he was charged and enabled him to prepare his defense against that charge; it was therefore sufficient. The testimony elicited at trial could not have nullified those qualities, and so could not have retroactively rendered the Indictment insufficient.

[46]    Although we have "discretion to review plain errors or defects affecting substantial rights, even when not raised at trial," we exercise this discretion "sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *Martin*, 2018 Guam 7 ¶ 11 (quoting *People v. Ueki*, 1999 Guam 4 ¶ 17). We strictly interpret the timing requirement of 8 GCA § 65.15 because under a "more permissive posture," a defendant would have "little incentive to comply" with the commands of the statute. *People v. Taisacan*, 2018 Guam 23 ¶ 13 (quoting *White*, 2005 Guam 20 ¶ 16). For this reason, "we have never before found good cause to excuse the delay in objecting to an indictment." *Id.* ¶ 12. We reach the same conclusion here: there was no good cause to excuse Bosi's delay in objecting to the indictment, so we will not review his challenge on appeal.

//

//

//

**D. The Omission of Bosi's Proposed Alibi Jury Instruction Was Not Erroneous**

[47]     Bosi next argues the trial court committed plain error by failing to "instruct the jury properly regarding proof of the victim's residence at the time of the offenses."  Appellant's Br. at 15.  Bosi assigns plain error to the trial court's omission of the following jury instruction:

> Evidence has been admitted that the complainant and defendant [were] not present at the time and place of the commission.  The Government has the burden of proving beyond a reasonable doubt defendant and complainant were present at the time and place.  If after consideration of all the evidence you have a reasonable doubt that the defendant and complainant were present at the time the crime was committed, you must find the defendant not guilty.

Tr. at 68 (Jury Trial, Apr. 24, 2019).  While Bosi requested this instruction, he ultimately did not object to its exclusion.  *Id.* at 75.  Because there was no objection, our review is for plain error.  *See, e.g.*, *Gargarita*, 2015 Guam 28 ¶ 11.  "Plain error is highly prejudicial error, which this court 'will not reverse unless (1) there was an error; (2) the error is clear or obvious under current law; (3) the error affected substantial rights; and (4) reversal is necessary to prevent a miscarriage of justice or to maintain the integrity of the judicial process.'"  *Id.* (quoting *Felder*, 2012 Guam 8 ¶ 19).  Under the plain error standard, the defendant bears the burden of proving that reversal is warranted.  *People v. Borja*, 2017 Guam 20 ¶ 14.

[48]     The first prong of plain error analysis requires the defendant to prove there was error.  *People v. Katzuta*, 2016 Guam 25 ¶ 22.  We find no error in excluding this jury instruction.  The transcripts show that Bosi's trial counsel proposed the instruction to instruct the jury about an alibi defense.  The trial court then rejected the alibi instruction based on its interpretation of *People v. Muritok*, 2003 Guam 21.  Tr. at 71-75, 79 (Jury Trial, Apr. 24, 2019).  In *Muritok*, this court held that if a defendant presents no evidence or argument he was "at the relevant time, somewhere other than the scene of the crime," then an alibi instruction would not be available to the defendant.  2003 Guam 21 ¶ 30.  Here, it is unclear what evidence showed that Bosi was somewhere other than

where the crime took place—his home—during the month-long period alleged in the indictment. Likewise, it is unclear what evidence showed that A.D.G. was never at Bosi's home during May 2016. Because we find no evidence in the record supporting either proposition, we affirm the trial court's decision to omit this alibi instruction.

[49] On appeal, Bosi offers a new interpretation of the same instruction: he argues the trial court plainly erred in omitting the instruction because it was needed to inform the jury "that prosecution had to prove beyond a reasonable doubt that the victim had to have been living in defendant's household at the time of the crime." Appellant's Br. at 18. However, the instruction is ill-suited to that purpose; it speaks of Bosi and A.D.G.'s *presence* at the time and place of the crime, not the *place of residence* of either party at the time and place of the crime. Bosi partially concedes this point but argues the instruction still "came closer to stating the law than any instructions requested by the prosecution or enunciated by the trial court." *Id.* at 17. We disagree this instruction "came close" to instructing the jury about Bosi's or A.D.G.'s place of residence, and we find no plain error in excluding the instruction on this basis either.

[50] The trial court did not err in excluding the proposed jury instruction because an alibi instruction was not warranted, and it did not err in failing to *sua sponte* include the instruction about Bosi and A.D.G.'s places of residence; the instruction does not serve that purpose. Because the trial court did not err in omitting the instruction, Bosi's argument fails plain error review and does not merit reversal on this basis.

## E.  The Emails Were Not Properly Authenticated, but the Error Was Harmless

[51] Bosi next argues that the trial court erred by admitting four emails sent by him to A.D.G. Bosi mainly focuses on one email, calling it "damaging" to his cause because the email appears to show him speaking obliquely about A.D.G. having "'kissable' lips." Appellant's Br. at

21. Bosi challenges the admission of the four emails into evidence, arguing they were not properly authenticated under Guam Rule of Evidence ("GRE") 901. *See id.* at 21-22. Because Bosi preserved this objection at trial, our review is for abuse of discretion. *See* Tr. at 24 (Jury Trial, Apr. 15, 2019); *In re N.A.*, 2001 Guam 7 ¶ 53.

[52]    "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Guam R. Evid. 901(a). There is no presumption of authenticity, and the burden of proof rests on the proffering party to establish authenticity. *See, e.g.*, *Hollie v. State*, 679 S.E.2d 47, 50 (Ga. Ct. App. 2009). Evidence may be authenticated through the testimony of a witness with personal knowledge "that a matter is what it is claimed to be." Guam R. Evid. 901(b)(1). In most cases involving the authentication of email evidence, "the most direct method of authentication is a statement from the author or an individual who saw the author compose and send the email." *Devbrow v. Gallegos*, 735 F.3d 584, 586-87 (7th Cir. 2013).

[53]    The People elected to authenticate the four emails through the testimony of A.D.G.'s father. However, A.D.G.'s father was neither the author of the emails, a direct recipient of the emails, nor a witness to Bosi composing or sending the emails. A.D.G.'s father did not even receive the emails directly from A.D.G., but instead received the emails at least third-hand from either A.D.G.'s mother or A.D.G.'s sister, who themselves were neither author nor witness to the production of the emails. Tr. at 25 (Jury Trial, Apr. 15, 2019). We agree with Bosi's argument that A.D.G.'s father lacked *personal* knowledge that the emails he was asked to authenticate were what they were purported to be; thus, his authentication efforts were not sufficient under GRE 901(b)(1).

[54]    Beyond GRE 901(b)(1), email evidence can also be authenticated by showing the email's "[d]istinctive characteristics," which may include its unique "[a]ppearance, contents, substance,

internal patterns . . . taken in conjunction with circumstances." Guam R. Evid. 901(b)(4). In federal courts, the substantively similar Federal Rule of Evidence 901(b)(4) is "one of the [rules] most frequently used to authenticate e-mail and other electronic records." *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 546 (D. Md. 2007); *see also Wilson v. State*, 30 N.E.3d 1264, 1268-69 (Ind. Ct. App. 2015) (applying similar reasoning in a state court system). Under Federal Rule of Evidence 901(b)(4)—and under GRE 901(b)(4) as well—"the key consideration in email authentication is not simply whether the witness on the stand was a sender or recipient of the email, but whether the testifying witness can speak to the email's unique characteristics, contents, and appearance." *United States v. Bertram*, 259 F. Supp. 3d 638, 641 (E.D. Ky. 2017).

[55]     A.D.G.'s father was not asked, and did not volunteer, that he recognized any unique characteristics, contents, or appearance of the emails that allowed him to identify the emails as authentic. Likewise, our review of the evidentiary exhibits reveals no obvious details that establish Bosi as the author of the emails. Although the emails were apparently sent from an email account using the name "Renato Bosi," the evidentiary exhibits do not show the email address from which the emails were sent. The emails are brief and reflect no content that could have only been known by Bosi. Finally, while the writing style of the emails is somewhat idiosyncratic, the People offered no further evidence to corroborate the assumption this writing style is Bosi's own. Thus, the emails were not properly authenticated under GRE 901(b)(4) either.

[56]     Because the emails were not properly authenticated under GRE 901, the trial court abused its discretion by admitting these emails into evidence. However, an evidentiary abuse of discretion does not merit a reversal of convictions if the error is harmless. *People v. Pugh*, 2018 Guam 14 ¶ 26. To determine whether an error was harmless, we examine these factors: "(1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly

admitted evidence; (3) the importance of the wrongly admitted evidence; and (4) whether such evidence was cumulative of other properly admitted evidence." *People v. Cepeda*, 2021 Guam 9 ¶ 23 (quoting *People v. Roten*, 2012 Guam 3 ¶ 41).

[57]     The first prong of this test is satisfied when the prosecution's case was strong enough to support a conviction even without the erroneously admitted evidence. *See Perez*, 2015 Guam 10 ¶ 36. Applying this test in *People v. Perez*, another criminal sexual conduct case, we held that "the testimony of a sexual assault victim does not need to be corroborated, and a victim's testimony alone can support a criminal sexual conduct conviction." *Id.* (citing *Campbell*, 2006 Guam 14 ¶ 40). The testimony of the victim in *Perez* was independently sufficient evidence to survive the first prong of the harmless error test. *See id.* Here, likewise, we have determined above that A.D.G.'s testimony was sufficient to establish all elements of CSC II and CSC IV, as charged, and because Bosi did not challenge the sufficiency of evidence supporting his Child Abuse conviction, we assume he concedes A.D.G.'s testimony was sufficient to establish all elements of that offense as well. Thus, like in *Perez*, the People's case against Bosi was strong enough to support the convictions despite the email evidence.

[58]     The second prong of the harmless error test—prosecutorial conduct regarding the evidence—weighs against a finding of harmless error. The prosecutor repeatedly referenced and emphasized the four emails, using part of his closing arguments to impugn Bosi's credibility by suggesting he was "feign[ing] surprise" on the witness stand when asked about the emails. Tr. at 18-21 (Jury Trial, Apr. 25, 2019). The "kissable lips" email also played a non-trivial role in the People's overall trial strategy, as the prosecutor elicited testimony from many witnesses about it. *See* Tr. at 22-25 (Jury Trial, Apr. 15, 2019) (A.D.G.'s father); *id.* at 91 (A.D.G.); *id.* at 120-22 (Pastor Puckett).

[59]    The third and fourth prongs of the harmless error analysis—the importance of the wrongly admitted evidence, and whether the wrongly admitted evidence was cumulative of properly admitted evidence—weigh in favor of harmlessness. The third prong supports harmless error because the emails were likely not significant to Bosi's convictions. We are confident that the jury convicted Bosi primarily based on A.D.G.'s testimony that criminal sexual conduct occurred, not based on emails regarding an untoward statement he apparently made several months later. We cannot conceive of a plausible scenario in which the jury disbelieved A.D.G.'s account that the sexual contact occurred, yet convicted Bosi nonetheless because of the content of these emails. The fourth prong of the harmless error analysis supports harmless error because the emails are cumulative of ample testimony. At least four witnesses, including both A.D.G. and Bosi himself, testified about the "kissable lips" message. A.D.G. testified that Bosi had sent her the "kissable lips" message as part of a practice of sending her emails "every day." Tr. at 91 (Jury Trial, Apr. 15, 2019). Pastor Puckett testified that he knew about the "kissable lips" message, had seen a copy of the message, and confronted Bosi about it; he also testified that Bosi acknowledged that he sent A.D.G. such a message. *Id.* at 120-21. Bosi's wife testified that she knew Bosi had written the message and was in the room with him when he wrote it. Tr. at 81-82 (Jury Trial, Apr. 16, 2019). Bosi himself testified that while he did not send the "kissable lips" message *as an email*, he authored a message on Facebook conveying this precise sentiment. Tr. at 83-84 (Jury Trial, Apr. 18, 2019). The email exhibits were thus cumulative of testimony elicited about the existence and authenticity of the contents of the emails.

[60]    An additional factor persuades us that the trial court's authentication error was harmless: Bosi does not deny sending the contents of the "kissable lips" email to A.D.G., but only argues he sent the message through a Facebook post rather than by email. Thus, there seems to be no debate

that the allegedly prejudicial content was authentic; Bosi's challenge focuses only on the technical requirements of GRE 901. The lack of evidence or argument that the emails were inauthentic supports a finding of harmless error. *See, e.g.*, *Bertram*, 259 F. Supp. 3d at 642 (challenge based only on authentication, absent allegation that emails were inauthentic, was "hyper-technical and abstract" and therefore not reversible error (citing *Midwest Retailers Ass'n v. City of Toledo*, 582 F. Supp. 2d 931, 934-35 (N.D. Ohio 2008))).

[61]     While the trial court abused its discretion by admitting the emails, we conclude the error was harmless. A non-constitutional error of this nature requires reversal "unless it is more probable than not that the error did not materially affect the verdict." *Jesus*, 2009 Guam 2 ¶ 54. Here, because there was sufficient evidence other than the email exhibits to establish the elements of the crime, because the email exhibits were not highly important to the convictions and were cumulative of other evidence, and because there has been no argument advanced that the email exhibits were inauthentic, it is more probable than not that the admission of the email exhibits did not materially affect the verdict. The trial court's authentication error therefore does not require reversal.

**F. The Trial Court Did Not Abuse its Discretion by Admitting the Spandex into Evidence**

[62]     Finally, Bosi argues that the trial court abused its discretion by admitting into evidence several pairs of "Spandex" undergarments. During the People's case-in-chief, A.D.G. testified that "[Bosi] bought a Spandex [for her] one time." Tr. at 90 (Jury Trial, Apr. 15, 2019). A.D.G. then explained that Bosi "came over to our house to give it to me [and] told me to hide it from my parents and not tell his wife because he bought it secretly." *Id.* at 91. Bosi did not object to this testimony or request the testimony be stricken under any evidentiary theory. *See id.* at 90-91. Later, during Bosi's case-in-chief, Bosi denied buying Spandex for A.D.G.; he testified, however,

that his wife sometimes distributed Spandex to members of Bosi's congregation who the Bosi family considered to be immodestly dressed. Tr. at 90-92 (Jury Trial, Apr. 18, 2019).

[63]    At the close of Bosi's case-in-chief, the People recalled A.D.G. as a rebuttal witness "for the limited purpose of introducing the Spandex [into evidence]." Tr. at 4 (Jury Trial, Apr. 24, 2019). The People introduced no physical evidence of the Spandex during A.D.G.'s original testimony, apparently because the People did not know before trial that A.D.G. still had the Spandex or that she intended to testify about it. *Id.* at 5-7. Bosi objected to the admission of the Spandex, arguing he was not aware of the Spandex exhibit before trial and was therefore prejudiced.

[64]    On appeal, Bosi renews his argument against the admission of the Spandex for violation of the trial court's discovery order. He also argues two additional evidentiary theories which he did not raise at trial: that the Spandex was improper character evidence under GRE 404(b) and was unfairly prejudicial under GRE 403.

### 1. The trial court did not abuse its discretion by imposing no sanction for the People's violation of the discovery order

[65]    Bosi first argues that the trial court abused its discretion by admitting the Spandex exhibit into evidence because information about the Spandex was untimely disclosed to Bosi. The discovery order required the People to disclose to Bosi all evidence the People intended to use at trial by April 2018. The People did not notify Bosi about the Spandex by that date. Bosi therefore argues the trial court abused its discretion by not excluding the Spandex exhibits as a sanction for this error.

[66]    When so ordered, the People must "disclose to the defense certain discoverable 'material and information within [the People's] possession or control, the existence of which is known, or by the exercise of due diligence may become known to the [People].'" *People v. Naich*, 2013

Guam 7 ¶ 25 (alterations in original) (quoting 8 GCA § 70.10(a) (2005)).  If the People violate a discovery order, the court may order the People to "comply with the prior order, grant a continuance, or issue such other order as it deems just under the circumstances."  8 GCA § 70.45 (2005).  However, a trial court may also elect to impose no sanctions on the People for their violation.  *See Nego*, 2021 Guam 3 ¶ 16 n.2 (citing *People v. Ayala*, 1 P.3d 3, 48-49 (Cal. 2000)).  The issue is committed to the discretion of the trial court, and so appellate review is for abuse of discretion.  On abuse of discretion review, an appellate court does not review whether an alternative course of action was available, but only whether the trial court's decision was allowable.  *Cf. Eastway Constr. Corp. v. City of New York*, 821 F.2d 121, 123 (2d Cir. 1987) ("The concept of discretion implies that a decision is lawful at any point within the outer limits of the range of choices appropriate to the issue at hand; at the same time, a decision outside those limits exceeds or, as it is infelicitously said, 'abuses' allowable discretion.").

[67]     When there is a violation of discovery obligations, "the court must determine whether the sanction employed [by the trial court] to remedy the infraction was appropriate."  *Nego*, 2021 Guam 3 ¶ 15 (alteration in original) (quoting *People v. Martinez*, 2017 Guam 23 ¶ 14).  "This requires that the sanction chosen be 'proportionate to the misconduct' and 'affect the evidence at trial and the merits of the case as little as possible.'"  *Id.* (quoting *Tuncap*, 1998 Guam 13 ¶¶ 23-24).  "Because the goal of sanctions is to get 'prompt and full compliance with the court's discovery orders,' the court should 'impose the least severe sanction that will [achieve that purpose].'"  *Id.* (quoting *Tuncap*, 1998 Guam 13 ¶ 24).

[68]     When analyzing the trial court's exercise of discretion regarding a discovery order, we typically consider four factors: "(1) reasons why the disclosure was not made; (2) the extent of the prejudice, if any, to the opposing party; (3) the feasibility of rectifying that prejudice by a

continuance, and (4) any other relevant circumstances." *Tuncap*, 1998 Guam 13 ¶ 25 (citing *United States v. Sarcinelli*, 667 F.2d 5, 6-7 (5th Cir. 1982)). Although we initially promoted these factors when evaluating whether an imposed sanction was too harsh, we have since extended these same factors in the opposite circumstance: where no sanction was imposed. *See Nego*, 2021 Guam 3 ¶ 16. In *People v. Nego*, the trial court made a record of its decision to apply no sanction, explicitly applying the four *People v. Tuncap* factors in its decision. *See id.* ¶¶ 17-26. These explicit findings allowed our court to properly review the trial court's exercise of discretion. *See id.* Here, it is not clear whether the trial court applied the *Tuncap* factors or, if it did, what findings it made regarding those factors. This makes our review more difficult; an appellate court is not well-positioned to make its own factual findings. For example, we cannot reasonably determine whether a continuance was feasible under the circumstances; considerations like these are not apparent from the record.

[69]     Given the lack of explicit findings by the trial court regarding the *Tuncap* factors, we approach the question from a different angle. Bosi proposes that the trial court abused its discretion by not excluding the Spandex exhibit. Appellant's Br. at 27. However, if we accepted this proposition, we would in effect create a rule of mandatory exclusion—if we held that the trial court was required to exclude, we would create a rule that the trial court *lacks* discretion to determine whether to exclude. But such a rule would conflict with 8 GCA § 70.45, which is phrased permissibly: "the court *may* order such party to comply with the prior order, grant a continuance, or issue such other order as it deems just under the circumstances." 8 GCA § 70.45 (emphasis added). And a rule of mandatory exclusion would contravene the policy rationales we articulated in *Tuncap*: the trial court should "apply sanctions which affect the evidence at trial and the merits of the case as little as possible," and should "impose the least severe sanction" that will compel

compliance with the discovery order. 1998 Guam 13 ¶¶ 23, 24 (internal citations omitted); *accord Nego*, 2021 Guam 3 ¶ 15.

[70]    Instead, we return to the basic principle of discretion: that a trial court's exercise of discretion is lawful if its decision is "within the outer limits of the range of choices appropriate to the issue at hand." *Eastway Constr. Corp.*, 821 F.2d at 123. Here, while we agree with Bosi that "[e]xclusion of [the Spandex exhibit] would have been *an* appropriate sanction for the prosecution's dilatory conduct," Appellant's Br. at 24 (emphasis added), we cannot say that exclusion was the *only* decision permissible under the circumstances. The only specific prejudice Bosi claims because of the discovery order violation is that "the defense was compelled to scramble" to find witnesses who could rebut the Spandex exhibit. Appellant's Br. at 25. However, as we held in *People v. Martinez*, "prejudice" in this context refers to "prejudice to the defendants' *substantial rights*, . . . and [it] does not encompass putting trial preparation into minor disarray." 2017 Guam 23 ¶ 18 (quoting *United States v. Garrett*, 238 F.3d 293, 299 (5th Cir. 2000)). Thus, "'[w]hether some extra effort was required by the defense counsel' is irrelevant to our consideration of [prejudice]." *Id.* (quoting *Garrett*, 238 F.3d at 299). Because there was no clear prejudice to Bosi besides his counsel's "scramble" to find and call rebuttal witnesses, a sanction less severe than exclusion could have been viable. And if a lesser sanction was viable under the circumstances, then we cannot say that the sanction of exclusion was mandatory.

[71]    On abuse of discretion review, this court will not simply "substitute its judgment for that of the trial court." *People v. Quintanilla*, 2001 Guam 12 ¶ 9 (citation omitted). While it was within the discretion of the trial court to exclude the Spandex exhibit, it was also within the

discretion to not impose a sanction of exclusion. Thus, the trial court did not abuse its discretion by admitting the Spandex exhibit against Bosi's discovery order violation objection.[8]

### 2. The admission of the Spandex evidentiary exhibit was not plainly erroneous under GRE 404(b) or GRE 403

[72]    Finally, Bosi argues two additional theories against the admission of the Spandex exhibit. He asserts the admission of that exhibit was erroneous under GRE 404(b), governing character evidence, and under GRE 403, governing the balance of probative value versus prejudicial effect. Appellant's Br. at 23-27. Bosi argues these issues under the abuse of discretion standard, but that is not the proper standard here. Bosi objected to the admission of the Spandex exhibit based on the discovery order violation, but it does not appear that Bosi ever objected under GRE 404(b) and/or GRE 403.[9] As noted in *People v. Quintanilla*, a party's objection at trial under one theory does not preserve abuse of discretion review for other theories not raised at trial. *See* 2020 Guam 8 ¶ 17. While our holding in *Quintanilla* specifically addressed newly raised theories of prosecutorial misconduct, the same principle applies to evidentiary theories. *See id.* (citing *United States v. Pratt*, 239 F.3d 640, 644 (4th Cir. 2001), *superseded by statute on other grounds*, 21st Century Department of Justice Appropriations Authorization Act, Pub. L. No. 107-273, § 3005(a), 116 Stat. 1758, 1805 (2002), *as recognized in United States v. Perez*, 22 F.4th 430, 432-33 (4th Cir. 2022); *United States v. Heath*, 970 F.2d 1397, 1407 (5th Cir. 1992)); *People v. Valdez*, 281

---

[8] Although we have affirmed the trial court's exercise of discretion, we are concerned about the need to once more address the allegation that the People failed to comply with a discovery order. *See People v. Nego*, 2021 Guam 3 ¶¶ 12-26; *People v. Martinez*, 2017 Guam 23 ¶¶ 13-22; *People v. Naich*, 2013 Guam 7 ¶¶ 24-46. Our decision today should be read to vindicate the discretion of the trial court, not to excuse dilatory conduct by the People. The failure to comply with a discovery order is not merely a violation of statute, but also of the ethical duties owed by prosecutors. We remind the People that a failure to comply with trial court discovery orders, whether intentional or negligent, may result in sanctions up to and including the reversal of otherwise-proper convictions.

[9] We remind appellate counsels that under the Guam Rules of Appellate Procedure, when "a ruling complained of on appeal is one to which a party must have objected at trial, to preserve a right of review, *e.g., a failure to admit or exclude evidence*," the appellant's brief must state "where in the record on appeal the objection and ruling are set forth." Guam R. App. P. 13(a)(9)(C) (emphasis added). Compliance with this rule is especially important where, as here, the trial transcript is voluminous.

P.3d 924, 961-62 (Cal. 2012) ("[W]e have consistently held that the 'defendant's failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable." (quoting *People v. Seijas*, 114 P.3d 742, 749 (Cal. 2005))). Accordingly, our review is for plain error. *Quintanilla*, 2020 Guam 8 ¶ 17. "Plain error is highly prejudicial error, which this court 'will not reverse unless (1) there was an error; (2) the error is clear or obvious under current law; (3) the error affected substantial rights; and (4) reversal is necessary to prevent a miscarriage of justice or to maintain the integrity of the judicial process.'" *Gargarita*, 2015 Guam 28 ¶ 11 (quoting *Felder*, 2012 Guam 8 ¶ 19).

[73]    As Bosi briefed these issues under the abuse of discretion standard, his argument does not graft well onto the plain error standard. But even if we assume the errors he asserts under GRE 404(b) and GRE 403 were "clear or obvious under current law," his challenges fail the third prong of the plain error test. To prove that an alleged error affected a defendant's substantial rights, a defendant must "demonstrate that the error was prejudicial (i.e., that it affected the outcome of the case)." *Felder*, 2012 Guam 8 ¶ 22 (quoting *People v. Mendiola*, 2010 Guam 5 ¶ 24). "[I]n the absence of evidence in the record to show the defendant was prejudiced, the government will prevail." *People v. Quitugua*, 2009 Guam 10 ¶ 31.

[74]    Bosi has not articulated a theory that but for the Spandex evidentiary exhibit, he would not have been convicted. Bosi asserts without detail that the Spandex exhibit was prejudicial because it gave rise to the inference he is a "dirty old man." Appellant's Br. at 24. We find this bald assertion insufficient to prove his substantial rights were affected. First, it is not clear to the court that the Spandex exhibit compelled such an inference. In Bosi's own words, the Spandex exhibit consisted of garments which are "worn over the ladies' customary underwear but which covers more of her legs." *Id.* at 23. It is not obvious to the court why such an exhibit inherently gives

rise to an inference of lecherousness. If any such inference was drawn from the Spandex, that inference would more probably arise from A.D.G.'s testimony about the circumstances by which Bosi gave her the Spandex and asked her to keep this gift a secret from Bosi's wife. However, Bosi did not object to that testimony under any theory, and on appeal he does not assign error—even plain error—to the admission of that testimony. Thus, even had the trial court excluded the Spandex *exhibit*, the Spandex *testimony*—and the allegedly damaging inference which could be drawn therefrom—would have remained. The Spandex exhibit was cumulative of—and arguably less inflammatory than—the Spandex testimony. Under these circumstances, Bosi has not shown that the admission of the Spandex exhibit affected the outcome of the case. Thus, Bosi's arguments under GRE 404(b) and GRE 403 fail the third prong of the plain error test, and we will not reverse his convictions on these bases.

## V. CONCLUSION

[75] The evidence of coercion was sufficient to sustain Bosi's criminal sexual conduct convictions, and none of the other errors Bosi assigns amount to reversible error. And the trial court's reduction of Bosi's CSC II convictions under 9 GCA § 80.22 was not an abuse of discretion. We therefore **AFFIRM** the judgment of conviction.

/s/
ROBERT J. TORRES
Associate Justice

/s/
KATHERINE A. MARAMAN
Associate Justice

/s/
F. PHILIP CARBULLIDO
Chief Justice